STATE OF HAWAII, Plaintiff-Appellee, *v.* HILARIO BUMANGLAG, Defendant-Appellant (Cr. No. 51368)

STATE OF HAWAII, Plaintiff-Appellee, *v.* DELFIN T. CRUZ, Defendant-Appellant (Cr. No. 51461)

and

STATE OF HAWAII, Plaintiff-Appellee, *v.* ROQUE C. SANTOS, Defendant-Appellant (Cr. No. 51437)

STATE OF HAWAII, Plaintiff-Appellee, *v.* REGINALD K. ARAKI, also known as Reginald Kazuyoshi Araki, Defendant-Appellant (Cr. No. 51436)

NOS. 7161, 7162, 7208 & 7209

SEPTEMBER 10, 1981

RICHARDSON, C.J., OGATA, MENOR, LUM AND NAKAMURA, JJ.

598

600

## OPINION OF THE COURT BY NAKAMURA, J.

These consolidated appeals involve interlocutory orders issued in four criminal cases where the defendants have been charged with promoting pornography in violation of HRS § 712-1214(1)(a).[1] The questions raised by defendants-appellants are whether motion picture films that are primary evidence of the putative offenses were improperly seized and therefore are excludable at trial and whether

---

[1] HRS § 712-1214 reads:

Promoting pornography. (1) A person commits the offense of promoting pornography if, knowing its content and character, he:

    (a) Disseminates for monetary consideration any pornographic material; or

    (b) Produces. presents, or directs pornographic performances for monetary consideration; or

    (c) Participates for monetary consideration in that portion of a performance which makes it pornographic.

    (2) Promoting pornography is a misdemeanor.

HRS § 712-1216(1)[2] which makes the dissemination of pornographic material prima facie evidence of the disseminator's knowledge of the character and content of such material is invalid for constitutional reasons. Applicable constitutional provisions and precepts impel the suppression of the films as evidence and the invalidation of § 712-1216(1).

## I.

The four cases stem from a series of raids conducted by members of the Honolulu Police Department in the spring of 1978 against two theaters owned and operated by Yuclan Enterprises, Inc. (hereafter Yuclan) where "X-rated"[3] or adult films were shown regularly, the Kaimuki Theatre and the Rex Theatre. The *modus operandi* followed by the police was substantially similar in all cases. In each, the operation commenced with a police officer's purchase of an admission ticket and his viewing of the allegedly pornographic movie and observation of the persons associated with its screening. The officer then prepared a detailed affidavit describing what was observed for presentation to a district judge who, on the strength of the document, issued warrants authorizing searches for and the seizure of films described in the affidavit and warrants for the arrests of persons named as projectionists or ticket sellers at the theaters.

The warrants were executed subsequently and the following seizures of purported evidence and arrests of alleged law violators were effected: on May 17, 1978, single copies of films entitled

---

[2] HRS § 712-1216(1) reads:

Promoting pornography; prima facie evidence. (1) The fact that a person engaged in the conduct specified by sections 712-1214 or 712-1215 is prima facie evidence that he engaged in that conduct with knowledge of the character and content of the material disseminated or the performance produced, presented, directed, participated in, exhibited, or to be exhibited.

[3] The reference here is to the rating system for films instituted by the Motion Picture Association of America. Under this system, films are classified into G, PG, R, or X categories in descending order of presumed suitability for viewing by minors. Those containing sexually explicit scenes usually are placed in the X category. But films may be X-rated for other reasons, such as the high incidence of violence. *See generally* Friedman, *The Motion Picture Rating System of 1968: A Constitutional Analysis of Self-Regulation by the Film Industry,* 73 Colum. L. Rev. 185 (1973).

"Visions of Clair" and "Journey of O" were seized at the Kaimuki Theatre and projectionist Hilario Bumanglag was arrested; on June 7, 1978, single copies of films "Easy Alice" and "The World of Suzie Wong" were seized and projectionist Reginald K. Araki and ticket seller Roque C. Santos were arrested at the Rex Theatre; on June 17, 1978, single copies of "Visions of Clair" and "Easy Alice" were seized again at the Kaimuki Theatre and ticket seller Delfin T. Cruz was arrested.

The defendants were charged thereafter in the District Court of Honolulu with promoting pornography in violation of HRS § 712-1214(1)(a). They all demanded jury trials when arraigned, and the cases were transferred to the Circuit Court of the First Circuit for further action. Following arraignments there, the defendants' trials were scheduled for September and October of 1978. But on June 30, 1978, Yuclan, claiming ownership of the films, filed motions for the return of the seized evidence pursuant to Rule 41(e), Hawaii R. Penal P. Each defendant joined in Yuclan's motions, requesting a suppression of the relevant films as evidence; each further moved for a declaration that HRS § 712-1216(1) was constitutionally infirm and consequently of no force and effect. Yuclan's motions for the return of property were granted in late August and September of 1978.

Defendants' motions in the cases involving Hilario Bumanglag and Delfin T. Cruz were presented to Judge Yoshimi Hayashi on September 6, 1978, and the motions pertinent to the cases involving Reginald K. Araki and Roque C. Santos were presented to Judge John C. Lanham on August 17 and 28, 1978. Judge Hayashi suppressed "Visions of Clair" but otherwise denied the suppression motions. He found a declaration on the validity of HRS § 712-1216(1) premature. Judge Lanham, on the other hand, found no ground to suppress any evidence but declared HRS § 712-1216(1) unconstitutional. Defendants sought and received permission from both circuit judges to seek interlocutory review in this court on all issues where the rulings had been adverse to them.

During the pendency of these proceedings, Yuclan also sought and was awarded injunctive relief in the United States District Court for the District of Hawaii enjoining the seizure and retention of its films by the Honolulu Police Department. *Yuclan Enterprises, Inc. v. Nakagawa,* No. 78-0268 (D. Haw., April 21, 1980). The injunction

was premised on a purported lack of a statutory or judicially fashioned adversary procedure for either a prior or a prompt post-seizure judicial determination of the obscenity *vel non* of films seized in the enforcement of HRS § 712-1214.[4]

## II.

HRS §§ 712-1214 and 712-1210 represent a legislative attempt to separate unprotected obscenity from other sexually oriented but constitutionally protected speech, a task fraught with difficulty because of the "variety of views" held by members of the Supreme Court on the pertinent distinction.[5] But in *State v. Manzo*, 58 Haw. 440, 573 P.2d 945 (1977), we concluded that § 712-1214's proscription of pornography as defined in § 712-1210(5) passed constitutional muster.[6] Defendants-appellants nevertheless assert guarantees of free speech and expression have been infringed in the attempted enforcement of the State's anti-pornography law and the law is constitutionally infirm in its procedural aspects. We can not disagree.

---

[4] The federal district court's injunction is discussed in greater detail in note 12 *infra,* and accompanying text.

[5] Obscenity in the view of a former justice is an "intractable" problem that "has produced a variety of views among the members of the Court unmatched in any other course of constitutional adjudication." Interstate Circuit, Inc. v. City of Dallas, 390 U.S. 676, 704-05 (1968) (concurring and dissenting opinion of Harlan, J.).

[6] The decision in State v. Manzo, *supra,* encompassed rulings on the validity of HRS §§ 712-1214(1)(a) and 712-1210(5) in the light of the First and Fourteenth Amendments of the United States Constitution and corresponding provisions of the Hawaii State Constitution, Article I, Sections 3 and 4, which have been renumbered as Article I, Sections 4 and 5, and now read:

Section 4.   No law shall be enacted respecting an establishment of religion, or prohibiting the free exercise thereof, or abridging the freedom of speech or of the press or the right of the people peaceably to assemble and to petition the government for a redress of grievances.

Section 5.   No person shall be deprived of life, liberty or property without due process of law, nor be denied the equal protection of the laws, nor be denied the enjoyment of the person's civil rights or be discriminated against in the exercise thereof because of race, religion, sex or ancestry.

## A

"The Fourth Amendment proscription against 'unreasonable . . . seizures,' applicable to the States through the Fourteenth Amendment, must not be read in a vacuum. A seizure reasonable as to one type of material in one setting may be unreasonable in a different setting or with respect to another kind of material." *Roaden v. Kentucky,* 413 U.S. 496, 501 (1973). When films are taken by the government from a commercial theater, reasonableness must be determined "in the light of the values of freedom of expression" because the pertinent setting presumptively invokes first amendment protection. *Id.* at 504.[7] *See also Lee Art Theatre, Inc. v. Virginia,* 392 U.S. 636 (1968); *A Quantity of Books v. Kansas,* 378 U.S. 205 (1964); *Marcus v. Search Warrant,* 367 U.S. 717 (1961). And "under the Fourteenth Amendment, a State is not free to adopt whatever procedures it pleases for dealing with obscenity . . . without regard to the possible consequences for constitutionally protected speech." *Marcus v. Search Warrant, supra,* 367 U.S. at 731.

*Roaden* and its forbears, particularly *Marcus, A Quantity of Books,* and *Lee Art Theatre,* teach us that the First Amendment stands as a joint yet separate source of limitations on a state's power to seek and impound expressive material. Where rights of free speech and expression may be implicated in a seizure, the First Amendment

---

[7] The Court's statement in this regard was:

The common thread of *Marcus, A Quantity of Books,* and *Lee Art Theatre* is to be found in the nature of the materials seized and the setting in which they were taken. See *Stanford v. Texas,* 379 U.S. 476, 486 (1965). In each case the material seized fell arguably within First Amendment protection, and the taking brought to an abrupt halt an orderly and presumptively legitimate distribution or exhibition. Seizing a film then being exhibited to the general public presents essentially the same restraint on expression as the seizure of all the books in a bookstore. Such precipitate action by a police officer, without the authority of a constitutionally sufficient warrant, is plainly a form of prior restraint and is, in those circumstances, unreasonable under Fourth Amendment standards. The seizure is unreasonable, not simply because it would have been easy to secure a warrant, but rather because prior restraint of the right of expression, whether by books or films, calls for a higher hurdle in the evaluation of reasonableness. The setting of the bookstore or the commercial theater, each presumptively under the protection of the First Amendment, invokes such Fourth Amendment warrant requirements because we examine what is "unreasonable" in the light of the values of freedom of expression.

413 U.S. at 503-04 (footnote omitted).

serves as a fount of additional restrictions. Hence, the seizure of films without a warrant though incident to a lawful arrest is nonetheless generally invalid, *Roaden v. Kentucky, supra,* notwithstanding that the seizure of evidence incident to a lawful arrest is generally sanctioned under fourth amendment principles. *See, e.g., Chimel v. California,* 395 U.S. 752, 764 (1969).

An additional teaching of the Supreme Court in this regard is that some form of judicial procedure "designed to focus searchingly on the question of obscenity" must be a prelude to the seizure and retention of allegedly obscene material. *Lee Art Theatre v. Virginia, supra,* 392 U.S. at 637; *A Quantity of Books v. Kansas, supra,* 378 U.S. at 210; *Marcus v. Search Warrant, supra,* 367 U.S. at 732. This procedural imperative reflects the Court's perception that the power to secure evidence may otherwise be applied to restrain speech. For as it pointedly reminds us, "[t]he use by government of the power of search and seizure as an adjunct to a system for the suppression of objectionable publications is not new" and "[t]he Bill of Rights was fashioned against the background of the knowledge that unrestricted power of search and seizure could also be an instrument for stifling liberty of expression." *Marcus v. Search Warrant, supra,* 367 U.S. at 724, 729.

The Court has been scrupulous in its insistence that the sensitive task of distinguishing legitimate from illegitimate speech be confided in a judicial office, rather than in the police. *Lee Art Theatre v. Virginia, supra; Marcus v. Search Warrant, supra.* The judicial proceeding, however, need not be of an adversary nature at the outset.[8] A warrant for the seizure of a copy of a film for the purpose of preserving it as evidence in a criminal proceeding may still be issued *ex parte,* if a detached, neutral judge is afforded full opportunity to focus searchingly on the question of obscenity prior to finding probable cause. *Heller v. New York,* 413 U.S. 483, 488-89 (1973). But in this situation, the seizure when effected must be followed by "a prompt judicial determination of the obscenity issue in an adversary proceeding . . . available at the request of any interested party." 413 U.S. at 492. And "prompt" in the Court's contemplation means "the shortest period 'compatible with sound judicial resolution.'" 413

---

[8] But an adversary hearing must be conducted prior to the seizure of a large quantity of expressive material for the purpose of destruction. *See* A Quantity of Books v. Kansas, *supra;* Marcus v. Search Warrant, *supra.*

U.S. at 492 n.9. Absent this speedy judicial declaration, a seizure and retention of the arguably protected material would be constitutionally impermissible.[9] For the delay may "in itself become a form of censorship." *Heller v. New York, supra,* 413 U.S. at 489, *citing United States v. Thirty-seven Photographs,* 402 U.S. 363, 367 (1971); *Freedman v. Maryland,* 380 U.S. 51, 57-59 (1965).

### B.

Turning to the question of whether the foregoing procedural requisites for valid seizures and retention of the films were satisfied, we initially observe the relevant arrests and seizures occurred on May 17, 1978, June 7, 1978, and June 17, 1978, but no adversary judicial proceedings on the issue of obscenity were conducted prior to the allowance of these interlocutory appeals in September of 1978.

The seizures in question were effected under warrants issued on the strength of sworn statements by police officers containing vivid, detailed accounts of scenes from the seized motion pictures and what transpired at the theaters where they were exhibited. Though the warrants were obtained *ex parte,* defendants-appellants do not seriously question the validity of the arrests and the initial seizures. But they argue the lack of a prompt judicial declaration following an adversary hearing on the obscenity *vel non* of the films vitiated the seizures.[10] Relying on *Heller v. New York, supra,* the State counters

---

[9] The Court's precise holding in this regard was:

If such a seizure is pursuant to a warrant, issued after a determination of probable cause by a neutral magistrate, and, following the seizure, a prompt judicial determination of the obscenity issue in an adversary proceeding is available at the request of any interested party, the seizure is constitutionally permissible. In addition, on a showing to the trial court that other copies of the film are not available to the exhibitor, the court should permit the seized film to be copied so that showing can be continued pending a judicial determination of the obscenity issue in an adversary proceeding. Otherwise, the film must be returned.

413 U.S. at 492-93 (footnotes omitted).

[10] They also contend the takings were not for a *bona-fide* purpose of preserving evidence. This contention is premised on the public statement of a deputy prosecutor to the effect that the prosecution's primary purpose in seizing the films was to inflict economic harm on the exhibitors and on the fact that two copies of the films "Visions of Clair" and "Easy Alice" were seized. We do not find it necessary to pass judgment on this assertion.

with an argument that defendants-appellants' position is untenable because they, like the petitioner in *Heller,* failed to request prompt judicial declarations on the pertinent issue.

Unlike the situation in *Heller v. New York, supra,* where the petitioner "made no pretrial motions seeking return of the film or challenging its seizure," 413 U.S. at 490, the record here reveals pretrial challenges to the validity of the seizures by Yuclan and defendants-appellants. Although the motions were for the return of property and the suppression of evidence and not direct requests for. quick adversary hearings on the issue of obscenity, they nevertheless raised questions about the obscenity *vel non* of the films and could have served as vehicles for the required determinations.[11] In *Heller,* the Court also found that "the barrier to a prompt judicial determination of the obscenity issue in an adversary proceeding was not the State, but petitioner's decision to waive pretrial motions and reserve the obscenity issue for trial." 413 U.S. at 490-91. That the record here does not manifest a compliance with the relevant demands of *Heller v. New York* for expeditious determinations can not be attributed solely to defendants-appellants. For there was no explicit procedure prescribed by statute or rule for the prompt judicial determination of the obscenity *vel non* of materials seized in the enforcement of HRS § 712-1214(1)(a). Nor was such a procedure improvised. In sum, the prompt judicial determinations demanded by *Heller* are absent here largely because there was no statutory or judicially fashioned procedure available at the request of any interested party.

The foregoing conclusion was also that reached by the United States District Court for the District of Hawaii. As noted, Yuclan's federal court action resulted in injunctive relief that temporarily precluded seizures of its films by the State. And as the district court ultimately felt it necessary "to remedy the failure of the State of Hawaii to provide a prior or prompt post-seizure judicial determination of obscenity in an adversary proceeding," the proceeding culminated in a permanent injunction compelling adherence to stringent procedures devised by the court to govern seizures of films

---

[11] With the exercise of some ingenuity, either Rule 12 or Rule 41 of the Hawaii Rules of Penal Procedure probably could have served as a means for providing the procedural safeguards prescribed by Heller v. New York, *supra. See, e.g.,* United States v. Sherwin, 539 F.2d 1 (9th Cir. 1976). But at this point, it is a moot question.

for evidentiary purposes.[12] In our view the abstention doctrine, as enunciated by *Younger v. Harris,* 401 U.S. 37 (1971), and *Hicks v. Miranda,* 422 U.S. 332 (1975), should have foreclosed the issuance of the permanent injunction, particularly after Yuclan secured the return of its films in the instant cases. Though the federal injunction was issued, the situation still calls for an authoritative judicial construction of the obscenity statute to supply procedural safeguards in conformity with *Heller's* dictates. *See State v. Raitz,* 63 Haw. 64, 73-74, 621 P.2d 352, 359-60 (1980), where we adopted a "reasonable rule" for the application of a statutory provision that otherwise would not have conformed with federal constitutional requirements.

While we surmised that Rule 12 or Rule 41 of the Hawaii Rules of Penal Procedure could have been applied below to provide safeguards consistent with *Heller, see* note 11 *supra,* the latter rule is the more appropriate vehicle for our present purpose of fashioning constitutionally firm procedures for the seizure of arguably protected material as evidence to further obscenity prosecutions. Rule 41 prescribes general procedures covering searches and seizures, and the seizure of even those materials arguably protected by the First Amendment and Article I, Section 4 of the State Constitution is subject thereto. But such seizures shall be further subject to the following requirements:

   1. A warrant for the seizure of films or other forms of ex-

---

[12] The permanent injunction states in part:

    IT IS FURTHER HEREBY ORDERED that any seizure of motion picture film shall either be preceded by an adversary hearing to focus searchingly on the issue of the film's alleged obscenity and to determine whether or not the motion picture film is unlawfully obscene, with written notice of the time and place of the hearing given to all interested parties at least forty-eight (48) hours prior to the commencement of the hearing *or* that any seizure of motion picture film be followed by such a hearing with said forty-eight (48) hours written notice, said hearing shall start within one hundred twenty (120) hours after seizure and be concluded within two hundred forty (240) hours after seizure. In the event that the motion picture film is judicially determined at such hearing to be unlawfully obscene, Defendant may retain said motion picture film for evidentiary use in the trial or trials related to the seizure. In the event that the motion picture film is judicially determined at such hearing not to be unlawfully obscene, Defendant shall forthwith return said motion picture film to the party from whom it was seized.

(Emphasis in the original). Yuclan Enterprises, Inc. v. Nakagawa, *supra,* (Amended Permanent Injunction filed April 21, 1980).

pression as evidentiary material to support an obscenity prosecution shall be issued contemporaneously with or subsequent to the filing of an arrest warrant, complaint, or charge in the case.

2. A warrant for the seizure of films and other forms of expression shall not be issued solely on the conclusory opinion of a police officer that the material is obscene.

3. A warrant may be issued after an adversary hearing that focuses searchingly on the question of the obscenity of the material sought, or it may be issued *ex parte*.

4. Where the warrant is an *ex parte* warrant for a seizure of films or a seizure that will significantly limit public access to other forms of expression, it shall contain a notice to the following effect:

(a) an interested party may move, pursuant to Rule 41(e), Hawaii R. Penal P., to have the issue of obscenity *vel non* of the seized material determined promptly in an adversary hearing and that the motion shall be heard on written notice given all other interested parties of at least forty-eight (48) hours;

(b) unless an interested party moves for a prompt determination within ten (10) days of the seizure or within five (5) days of the arraignment of the defendant in the related prosecution before the court where he is to be tried, the party shall be deemed to have waived his right to such hearing and the issue of obscenity shall be determined at trial.

5. If a party moves for a prompt determination, a hearing on the issue of obscenity shall be commenced within seven (7) days of the filing of the motion, and a decision shall be rendered within ten (10) days thereafter, unless justice demands otherwise.

6. If the material is found to be obscene, the State may retain the material for use as evidence in the related prosecution. If the material is determined not to be obscene, it shall be returned forthwith to the party from whom it was seized.

7. When the material seized is a motion picture film and a showing is made at any time prior to the determination of obscenity that other copies of the film are unavailable for exhibition, the owner or exhibitor shall be permitted to copy the film for exhibition pending the determination.

## C.

Having decided that the State's seizures and retention of Yuclan's films were inconsistent with applicable constitutional principles, we now consider whether suppression of the films as evidence is the appropriate remedy.

The State sees no fourth amendment violations, inasmuch as the initial seizures were effected under proper search warrants. Thus, it contends there is no ground for the suppression of evidence, even assuming an impingement of first amendment rights flowing from the absence of prompt judicial determinations on obscenity. The exclusionary rule, it claims, is a specific remedy provided by the Supreme Court to further fourth amendment protections, not speech or expression. And it maintains there is no precedent for applying the rule in the pertinent situation. We do not agree, for the State's argument ignores the salient holdings of *Roaden v. Kentucky, supra,* and *Heller v. New York, supra.*

The issue in *Roaden* as stated by the Court was "whether the seizure of allegedly obscene material, contemporaneous with and as an incident to an arrest for the public exhibition of such material in a commercial theater may be accomplished without a warrant." 413 U.S. at 497. In holding such a seizure unreasonable, the Court stated its rationale therefor in these terms:

> Seizing a film then being exhibited to the general public presents essentially the same restraint on expression as the seizure of all the books in a bookstore. Such precipitate action by a police officer, without the authority of a constitutionally sufficient warrant, is plainly a form of prior restraint and is, in those circumstances, unreasonable under Fourth Amendment standards. The seizure is unreasonable, not simply because it would have been easy to secure a warrant, but rather because prior restraint of the right of expression, whether by books or films, calls for a higher hurdle in the evaluation of reasonableness.

413 U.S. at 504. Hence, a warrantless seizure of a movie film then being exhibited to the public was deemed unreasonable under fourth amendment standards because the taking constituted a prior restraint proscribed by the First Amendment. The prohibition of unreasonable searches and seizures, normally applied to further privacy interests, was applied in this instance to protect free speech

and the public's access thereto. In essence, first amendment values were enhanced through the Fourth Amendment. More significantly, the condemnation of the prior restraint on expression was enforced through the exclusionary rule, the Court concluding that "the admission of the film in evidence require[d] reversal of petitioner's conviction." 413 U.S. at 506.

The precise question posed by the Court in *Heller* was "whether a judicial officer authorized to issue warrants, who has viewed a film and finds it to be obscene, can issue a constitutionally valid warrant for the film's seizure as evidence in a prosecution against the exhibitor, without first conducting an adversary hearing on the issue of probable obscenity." 413 U.S. at 484. The issue thus entailed the legality of a search warrant, definitely a fourth amendment question. As we noted earlier, the Court held that a prior adversary hearing on obscenity was not always a prerequisite for the issuance of a valid warrant, but ruled that a prompt judicial determination after an adversary hearing was necessary if no prior adversary hearing had occurred. *See* note 9 *supra.* That a seizure pursuant to a warrant issued without a prior hearing retains validity only if a prompt post-seizure hearing occurs was emphasized by the Court when it said:

> If such a seizure is pursuant to a warrant, issued after a determination of probable cause by a neutral magistrate, and, following the seizure, a prompt judicial determination of the obscenity issue in an adversary proceeding is available at the request of any interested party, the seizure is constitutionally permissible.

413 U.S. at 492 (footnote omitted).[13] We can only conclude from the above that a seizure of arguably protected material would be void *ab initio* if the safeguards imposed by *Heller* are either unavailable or disregarded.

---

[13] The rationale for the rule was stated as follows:

With such safeguards, we do not perceive that an adversary hearing *prior* to a seizure by lawful warrant would materially increase First Amendment protection.... The necessity for a prior judicial determination of probable cause will protect against gross abuses, while the availability of a prompt judicial determination in an adversary proceeding *following* the seizure assures that difficult marginal cases will be fully considered in light of First Amendment guarantees, with only a minimal interference with public circulation pending litigation.

413 U.S. at 493 (emphasis in the original) (citation omitted).

The State's argument is flawed by its implication that evidence is excludable from state criminal proceedings on federal constitutional grounds only where there is a direct governmental interference with fourth amendment rights of privacy. For even before *Mapp v. Ohio,* 367 U.S. 643 (1961), declared that such rights were enforceable against the States through the Due Process Clause of the Fourteenth Amendment by means of an exclusionary rule, evidence obtained in violation of the Fourteenth's Due Process Clause itself was deemed inadmissible in state criminal trials. *See, e.g., Rogers v. Richmond,* 365 U.S. 534 (1961); *Blackburn v. Alabama,* 361 U.S. 199 (1960); *Rochin v. California,* 342 U.S. 165 (1952); *Watts v. Indiana,* 338 U.S. 49 (1949); *Ashcraft v. Tennessee,* 322 U.S. 143 (1944); *Chambers v. Florida,* 309 U.S. 227 (1940).

*Mapp v. Ohio, supra,* is *Roaden*'s precursor for more than one reason. The defendant in the former case was convicted of the knowing possession of lewd and lascivious books, pictures, and photographs in violation of a provision of state law. The case likewise called for a discussion of separate but related freedoms guaranteed by the federal constitution. And the Court's conclusion that one freedom (protected under the Fourth Amendment) was complementary to another (protected under the Due Process Clause of the Fifth or Fourteenth Amendment) and they worked together to assure that "no man is to be convicted on unconstitutional evidence,"[14] stands as precedent for a similar conclusion here.

We believe the suppression of the seized films as evidence would be the only effective sanction for the relevant infringements of first and fourth amendment freedoms. We reach this conclusion though

---

[14] The Court's full statement in this regard reads as follows:

We find that, as to the Federal Government, the Fourth and Fifth Amendments and, as to the States, the freedom from unconscionable invasions of privacy and the freedom from convictions based upon coerced confessions do enjoy an "intimate relation" in their perpetuation of "principles of humanity and civil liberty [secured] . . . only after years of struggle," . . . . They express "supplementing phases of the same constitutional purpose — to maintain inviolate large areas of personal privacy." . . . The philosophy of each Amendment and of each freedom is complementary to, although not dependent upon, that of the other in its sphere of influence — the very least that together they assure in either sphere is that no man is to be convicted on unconstitutional evidence.

367 U.S. at 656-57 (citations and footnote omitted).

we are fully mindful that lower federal tribunals considering this issue after *Roaden* and *Heller* have arrived at another conclusion. These courts have generally held that "[w]hen materials are seized in violation of the first amendment, the appropriate remedy is return of the seized property, but not its suppression as evidence at trial." *United States v. Bush,* 582 F.2d 1016, 1021 (5th Cir. 1978), *quoting United States v. Sherwin, supra,* 539 F.2d at 8 n.11. They have reasoned that suppression is inappropriate where the seizure is defective for want of an adversary hearing because "the primary right involved is the public's First Amendment right of access rather than the defendant's Fourth Amendment immunity from unreasonable search and seizure." *United States v. Pryba,* 502 F.2d 391, 404-05 n.97 (D.C. Cir. 1974) (*citing Huffman v. United States,* 470 F.2d 386, 392 (D.C. Cir. 1971)), *rev'd on other grounds,* 502 F.2d 419 (D.C. Cir. 1974), a pre-*Roaden* decision.[15] But we are not convinced there is reason to treat the fruits of unreasonable seizures differently on the foregoing basis, for no such distinction was drawn by the Court in *Roaden.* To the contrary, "the admission of the film in evidence require[d] reversal of the petitioner's conviction," 413 U.S. at 506, after the seizure was examined and ruled invalid "in the light of the values of freedom of expression." 413 U.S. at 504.

The lack of obligatory adversary hearings, the impoundment of films then being exhibited to the public for upwards of three months or more, and the preclusion of their exhibition during these periods lead us to conclude the temporary restraints became "a form of censorship" in these cases. 413 U.S. at 490.[16] The belated return of the films to their owner did not rectify the unsanctioned interference with arguably protected rights of expression and the public's access thereto. And "[i]f constitutional rights are to be anything

---

[15] Other cases reaching this general conclusion include United States v. Sanders, 597 F.2d 63, 64 (5th Cir. 1979), *rev'd on other grounds sub nom.* Walter v. United States, 447 U.S. 649 (1980), and United States v. Cangiano, 464 F.2d 320, 328 (2d Cir. 1972), *vacated on other grounds,* 413 U.S. 913 (1973), *on remand,* 491 F.2d 905 (1974), *cert. denied,* 418 U.S. 934 (1974).

[16] In *Heller,* there was "no showing that the seizure of a copy of the film precluded its continued exhibition." 413 U.S. at 490. And as we have noted, "the barrier to a prompt judicial determination of the obscenity issue was . . . petitioner's decision to waive pretrial motions and reserve the obscenity issue for trial." 413 U.S. at 490-91.

more than pious pronouncements, then some measurable consequence must be attached to their violation." Oaks, *Studying the Exclusionary Rule in Search and Seizure,* 37 U. Chi. L. Rev. 665, 756 (1970). We thus hold that suppression of the films as evidence is proper here. *Roaden v. Kentucky, supra; People v. Kimmel,* 34 Ill. 2d 578, 583-84, 217 N.E.2d 785, 788 (1966). In accord with *State v. Manzo, supra,* our ruling is premised on relevant provisions of the Hawaii Bill of Rights, Article I, Section 4 (Freedom of Religion, Speech, Press, Assembly and Petition) and Section 7 (Searches, Seizures and Invasion of Privacy) of the State Constitution, as well as on the First and Fourth Amendments.

Suppression of the evidence here is designed to enforce the prohibition against prior restraint and censorship and to vindicate the public's right of access to information and expressive material arguably protected by the First Amendment. Our prescribed procedure recognizes that suppression for want of a prompt post-seizure adversary hearing would be appropriate only where a lack thereof will significantly limit public access to information and expressive material. Seizure of a single book where identical copies remain on the store's shelves would not trigger suppression because such right would not be restricted. But seizure of a painting or other expressive material of which there are no copies would require suppression if post-seizure procedures were constitutionally inadequate. Each search and seizure case turns on its own facts, and the type of material seized and the setting in which seizure occurred determine whether the remedy is appropriate in a speech-related context. *Roaden v. Kentucky, supra,* 413 U.S. at 501.

· III.

While the ruling that the seized films are inadmissible as evidence may have rendered a decision on the alleged facial invalidity of HRS § 712-1216(1) unnecessary, we nevertheless choose to examine the issue. We do so even though constitutional questions ordinarily are not decided unless "absolutely necessary to a decision of the case," and defendants-appellants may be unable to claim injury from the statute's operation due to the foregoing holding on the inadmissibility of the films. *Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 346-48 (1936) (Brandeis, J., concurring). The in-

volvement of the First Amendment,[17] the declaration of constitutional infirmity by one of the circuit judges, and the State's joinder in defendants-appellants' plea for a decision strongly suggest the advisability of a present determination on the constitutionality of HRS § 712-1216(1).[18]

## A.

Our analysis commences with the statutory language involved, that portion of HRS § 712-1214 reading:

(1) A person commits the offense of promoting pornography if, *knowing its content and character,* he:

(a) Disseminates for monetary consideration any pornographic material . . . [,]

that part of HRS § 712-1216 reading:

(1) The fact that a person engaged in the conduct specified by sections 712-1214 or 712-1215 is prima facie evidence that he engaged in that conduct with knowledge of the character and content of the material disseminated or the performance produced, presented, directed, participated in, exhibited, or to be exhibited . . . [,]

and HRS § 701-117, reading:

Prima facie evidence of a fact is evidence which, if accepted in its entirety by the trier of fact, is sufficient to prove the fact, pro-

---

[17] In State v. Manzo, we recognized the exception to the rule that a person may not challenge a statute on the ground that it might be applied unconstitutionally in other circumstances and said:

It is "the traditional rule that a person may not challenge a statute upon the ground that it might be applied unconstitutionally in circumstances other than those before the court." . . . In the present context, application of this rule would require Appellant to show that no conceivable combination of facts could both fit the charge and be a constitutional basis of guilt. But where the First Amendment is involved an exception to this rule has been created (the overbreadth doctrine) pursuant to which it is sufficient, in order to establish facial invalidity, merely to show that the challenged statute is broad enough in its terms to suppress protected speech, without the need of showing that the specific conduct before the court is protected.

58 Haw. at 445, 573 P.2d at 949 (citations omitted). *See also* Bates v. State Bar of Arizona, 433 U.S. 350, 380 (1977).

[18] However, we do not reach the issue of the constitutionality of HRS § 712-1216's application to § 712-1215, Promoting pornography for minors.

vided that no evidence negativing the fact, which raises a reasonable doubt in the mind of the trier of fact, is introduced.

(Emphasis added). The gravamen of the proscribed conduct is the spreading of obscene matter for monetary gain with knowledge of what the material contains. The defined offense includes an element of scienter or awareness that has been declared a constitutional requirement by Supreme Court doctrine. *Smith v. California,* 361 U.S. 147 (1959). *See also Mishkin v. New York,* 383 U.S. 502, 510 (1966). Thus, an employee of a commercial theater would be guilty of promoting pornography only if he participated in the exhibition of an obscene film with the requisite knowledge of its subject matter and content; a person who sells an obscene book would be guilty only if the sale is made with knowledge of the book's "pornographic context and character."[19]

Section 712-1216(1) provides that the dissemination of obscene material is prima facie evidence of the disseminator's familiarity with the material's content and character. When it is read in conjunction with the definition of "prima facie evidence" in § 701-117, § 712-1216(1) permits a constitutionally demanded element of the crime to be proved by an inference drawn from the proof of another element. Section 701-117 acknowledgedly represents an evidentiary device designed to "enable the prosecution to get to the jury on something less than positive proof of a fact which may be almost solely within the knowledge of the defendant." Penal Code Commentary on § 701-117. Moreover, the prima facie evidence rule "helps the prosecution to get its case to the jury without necessarily meeting its burden of persuasion." *Id.*

But the "Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship,* 397 U.S. 358, 364 (1970); *Sandstrom v. Montana,* 442 U.S.

---

[19] The Penal Code Commentary on § 712-1214 reads in relevant part:

It should be pointed out that the definition of the offense provides that the accused must act knowingly with respect to the *pornographic context and character* of the material he disseminates or the performance he presents, directs, or in which he participates. This meets the constitutionally imposed requirement of mens rea in this type of case* and is in accord with the general principles set forth in Chapter 702 of this Code.

(Emphasis in the original). *The footnote at this point cites Smith v. California, *supra.*

510, 523 (1979); *State v. Pimentel,* 61 Haw. 308, 311, 603 P.2d 141, 142 (1979). Hence, an evidentiary device such as a presumption or an inference "must not undermine the factfinder's responsibility at trial, based on evidence adduced by the State, to find the ultimate facts beyond a reasonable doubt." *Ulster County Court v. Allen,* 442 U.S. 140, 156 (1979). We have ruled that a mandatory presumption or inference may have this impermissible burden-shifting effect. *State v. Pimentel, supra.* We also have recognized that due process imposes a limitation that there be "a natural and rational evidentiary relation between the facts proven and the ultimate fact which the statute authorizes to be found." *State v. Dwyer,* 57 Haw. 526, 529, 560 P.2d 110, 112 (1977).[20] Mr. Justice Powell has expressed the foregoing rule in more eloquent terms in *Ulster County Court v. Allen, supra,* where he said:

> [T]he Constitution restricts the court in its charge to the jury by requiring that, when particular factual inferences are recommended to the jury, those factual inferences be accurate reflections of what history, common sense, and experience tell us about the relations between events in our society. Generally, this due process rule has been articulated as requiring that the truth of the inferred fact be more likely than not whenever the premise for the inference is true. Thus, to be constitutional a presumption must be at least more likely than not true.

442 U.S. at 172 (dissenting opinion). The necessity for this rational

---

[20] We followed the Supreme Court's rationale in fashioning the foregoing standard for determining the validity of a statutorily established inference. Our statement in this regard was:

The constitutional validity of such a statutory rule of evidence is to be tested as follows:

A statutory presumption cannot be sustained if there be no rational connection between the fact proved and the fact presumed, if the inference of one from proof of the other is arbitrary because of a lack of connection between the two in common experience. (*Tot v. United States,* 319 U.S. 463, 467 (1943)).

In *Leary v. United States,* 395 U.S. 6, 36 (1969), the test was restated:

[A] criminal statutory presumption must be regarded as "irrational", or "arbitrary" and hence unconstitutional, unless it can at least be said with substantial assurance that the presumed fact is more likely than not to flow from the proved fact on which it is made to depend. And in the judicial assessment the congressional determination favoring the particular presumption must of course weigh heavily.

57 Haw. at 529-30, 560 P.2d at 112-13.

relationship cannot be overemphasized here, since the express purpose of the "prima facie evidence" rule is to enable the prosecution "to get its case to the jury without necessarily meeting its burden of persuasion." Penal Code Commentary on § 701-117. When an inference does not accurately reflect "what history, common sense, and experience tell us about the relations between events in our society," 442 U.S. at 172, a likelihood of a defendant being convicted on less than the requisite proof beyond a reasonable doubt is assuredly present. And we have not hesitated to restrict the application of an evidentiary device where due process demands.

The primary issue in *State v. Brighter,* 61 Haw. 99, 595 P.2d 1072 (1979), was whether an inference of a knowing possession of a dangerous, harmful, or detrimental drug drawn from the presence of such a drug in a motor vehicle, premised on HRS §§ 712-1251[21] and 701-117, was constitutionally firm. The fundamental question confronting us now was posed for decision, but not within a context arguably implicating first amendment freedoms. We reiterated a prior holding that "[t]he requirements of due process impose[d] limitations on the power of the legislature to authorize inferences of fact to be drawn," *State v. Brighter, supra,* 61 Haw. at 103, 595 P.2d at 1075, *citing State v. Dwyer, supra,* 57 Haw. at 529, 560 P.2d at 112, and employed the "natural and rational evidentiary relation" standard to determine the validity of the inference as applied. While we did not invalidate HRS § 712-1251, we limited its application to situations where the quantities of drugs "are clearly greater than quantities which would be possessed merely for personal use," 61 Haw. at 110, 595 P.2d at 1079, for we were unable to find a rational relationship between the presence of a drug in a motor vehicle in quantities likely to be possessed only for personal use and the knowing possession of the drug by everyone in the vehicle.

The secondary issue in *Brighter* was whether the instruction defining "prima facie evidence" for the jury caused the burden of proof to be shifted to the defendant. Although the instruction

---

[21] HRS § 712-1251 reads in pertinent part:

(1) Except as provided in subsection (2), the presence of a dangerous drug, harmful drug, or detrimental drug in a motor vehicle, other than a public omnibus, is prima facie evidence of knowing possession thereof by each and every person in the vehicle at the time the drug was found.

"faithfully tracked the language" of HRS § 701-117, we nonetheless concluded a clarifying instruction, that the jury "*could* — but was not *required* to — find the element of knowing possession upon proof of the underlying facts," should also have been given to prevent a possible misleading effect. 61 Haw. at 111, 595 P.2d at 1080 (emphasis in the original). We found that in the absence of such elucidation the statutory definition of "prima facie evidence" could have misled the jury into believing it was required to find knowing possession from the proof of the presence of drugs in the vehicle. Hence, the application of HRS § 701-117 also was modified.

### B.

In contrast to the circumstances in *Dwyer* and *Brighter*, the involvement of arguably protected first amendment freedoms makes the facial validity of HRS § 712-1216(1), rather than a particular application thereof, our primary concern here.[22] Defendants-appellants view the statute as an overbroad law impinging upon first amendment freedoms as they contend it has the effect of ensnaring all who may participate in the spreading of obscene matter, even those who may do so without an awareness of its character, in the web of the law's prohibitions. The justification for the application of overbreadth analysis is that "[a]n overbroad statute might serve to chill protected speech." *Bates v. State Bar of Arizona, supra,* 433 U.S. at 380. For "First Amendment interests are fragile interests, and a person who contemplates protected activity might be discouraged by the *in terrorem* effect of the statute." *Id.*

Consistent with the above, the Court also has imposed a stringent standard for the scrutiny of devices affecting the burden of proof where first amendment freedoms are involved. Its "decisions furnish examples of legal devices and doctrines, in most applications consistent with the Constitution, which cannot be applied in settings where they have the collateral effect of inhibiting the freedom of

---

[22] "The First Amendment overbreadth doctrine . . . represents a departure from the traditional rule that a person may not challenge a statute on the ground that it might be applied unconstitutionally in circumstances other than those before the court." Bates v. State Bar of Arizona, *supra,* 433 U.S. at 380.

We have followed the overbreadth doctrine when appropriate. *See* note 17 *supra.*

expression." *Smith v. California, supra,* 361 U.S. at 150-51. Where the Court has "conceived that . . . [a] device was being applied in a manner tending to cause even a self-imposed restriction of free expression," the application of the device has been struck down. 361 U.S. at 151.[23]

Viewing the pertinent statutory provision and circumstances in the light of the foregoing doctrine and related precepts, we conclude HRS § 712-1216(1) harbors a constitutional infirmity. Defendants-appellants argued and presented testimony in the circuit court that a salesclerk was less likely than not to know the contents of the numerous publications offered for sale by a large bookstore.[24] We find this difficult to discount, for a conclusion that a person who sold a book also was familiar with its character and content does not comport with what common sense and experience tell us about booksellers, salesclerks and their knowledge of the contents of books.

We think HRS § 712-1216(1), if applied, may have a collateral effect of inhibiting free expression. Its application would tend to limit public access to protected material because booksellers may then restrict what they offer to works they are familiar with and consider "safe." The distribution of protected, as well as obscene, matter may be affected by this self-censorship. And a statute with

---

[23] The Court's full statement in this regard was:

The States generally may regulate the allocation of the burden of proof in their courts, and it is a common procedural device to impose on a taxpayer the burden of proving his entitlement to exemptions from taxation, but where we conceived that this device was being applied in a manner tending to cause even a self-imposed restriction of free expression, we struck down its application. *Speiser v. Randall,* 357 U.S. 513. See *Near v. Minnesota, supra,* at 712-713. It has been stated here that the usual doctrines as to the separability of constitutional and unconstitutional applications of statutes may not apply where their effect is to leave standing a statute patently capable of many unconstitutional applications, threatening those who validly exercise their rights of free expression with the expense and inconvenience of criminal prosecution. *Thornhill v. Alabama,* 310 U.S. 88, 97-98. Cf. *Staub v. City of Baxley,* 355 U.S. 313.

361 U.S. at 151 (footnote omitted).

[24] A clerk at the University of Hawaii Bookstore testified it was impossible for her to know the content and character of the numerous titles in the store's inventory. We think the same testimony could have been elicited from employees of any of the establishments operated by the Honolulu Bookshops, Ltd. From even a limited familiarity with these bookstores, we would have to say that arguably unprotected material is carried by them.

such effect does not withstand constitutional scrutiny under the first amendment overbreadth doctrine.[25]

Among the reasons advanced by the State to uphold the provision is that proof of scienter otherwise would be well-nigh impossible. Admittedly, our holding renders the task more onerous. When the State of California suggested in *Smith v. California, supra,* that any attempt to regulate obscenity would be ineffective if the requirement of scienter was not dispensed with, the Court's response was:

> We might observe that it has been some time now since the law viewed itself as impotent to explore the actual state of a man's mind. See Pound, The Role of the Will in Law, 68 HARV. L. REV. 1. Cf. *American Communications Assn. v. Douds,* 339 U.S. 382, 411. Eyewitness testimony of a bookseller's perusal of a book hardly need be a necessary element in proving his awareness of its contents. The circumstances may warrant the inference that he was aware of what a book contained, despite his denial.

361 U.S. at 154. The foregoing response would be appropriate here too. The Court's observations in this regard are reiterated by the holdings of several other courts that scienter may be demonstrated by circumstantial evidence.[26] We believe the State should not expe-

---

[25] We are aware this holding is contrary to that in a New York case where the validity of a somewhat similarly worded presumption applicable to an obscenity prosecution was upheld. *See* People v. Kirkpatrick, 64 Misc.2d 1055, 316 N.Y.S.2d 37 (1970), *aff'd,* 69 Misc.2d 212, 329 N.Y.S.2d 769 (1971), *aff'd,* 32 N.Y.2d 17, 343 N.Y.S.2d 70, 295 N.E.2d 753 (1973), *appeal dismissed,* 414 U.S. 948 (1973). We also realize the appeal from the Court of Appeals of New York to the Supreme Court was summarily dismissed. But it does not appear the presumption there was subjected to overbreadth analysis by the courts of New York, although the dissenting opinion filed in the Court of Appeals discusses a possible "chilling effect."

[26] *E.g.,* Great Speckled Bird of Atlanta Coop. News Project v. Stynchcombe, 298 F. Supp. 1291, 1292-93 (N.D. Ga. 1969); Ballew v. State, 138 Ga. App. 530, 533-34, 227 S.E.2d 65, 68 (1976), *rev'd on other grounds sub nom.* Ballew v. Georgia, 435 U.S. 223 (1978); Hagood v. State, ____ Ind. App. ____, ____, 395 N.E.2d 315, 318 (1979); *accord,* People v. Tannahill, 38 Ill. App.3d 767, 772-73, 348 N.E.2d 847, 851-52 (1976) (scienter properly implied to owner-operator of bookstore where magazines were arranged and priced according to their sexual explicitness); Richards v. State, 497 S.W.2d 770, 774-76 (Tex. Civ. App. 1973) (evidence of defendant's ownership together with description of theater's interior and advertisements sufficient to establish scienter). Compare cases holding a constructive knowledge of the content of the obscene material, knowledge of facts which would put a reasonable person on notice as to suspect the nature of the material's content and character, satisfies the constitutionally required scienter element: Newman v. Conover, 313 F. Supp. 623, 630-31

rience great difficulty in convincing a fact-finder that the operator of an adult bookstore whose shelves are stocked mostly with sexually oriented publications is aware of the contents, character, and nature of his wares, even without a statutory presumption or inference. For the requisite scienter is not knowledge that the material was legally obscene, as the Court explains in *Hamling v. United States,* 418 U.S. 87 (1974).[27]

The orders denying the motions to suppress evidence and the order denying the motion to declare HRS § 712-1216(1) invalid are reversed, and the cases are remanded to the circuit court for further proceedings not inconsistent with this opinion.

*Evan R. Shirley (Wesley H. Ikeda* with him on the briefs; *Shirley & Jordan,* of counsel) for defendants-appellants.

*Arthur E. Ross,* Deputy Prosecuting Attorney, for plaintiff-appellee.

---

(N.D. Texas 1970); Great Speckled Bird of Atlanta Coop. News Project v. Stynchcombe, *supra,* at 1292-93; Ballew v. State, *supra,* 138 Ga. App. at 534, 227 S.E.2d at 68; State v. Thompkins, 263 S.C. 472, 484-85, 211 S.E.2d 549, 554 (1975). *But cf.* Grove Press, Inc. v. Evans, 306 F. Supp. 1084, 1088 (E.D. Va. 1969) (presumption that anyone possessing obscene item in public both knew its character and harbored the intent to distribute it commercially was unconstitutional since the imputed scienter was unlikely in both respects and it placed upon possessor the burden of going forward with evidence); People v. Andrews, 23 Cal. App.3d Supp. 1, 8, 100 Cal. Rptr. 276, 279-80 (1972) (where only showing made was that defendant was the owner of the selling outlet which distributed the obscene item, there was insufficient circumstantial evidence of scienter to convict).

[27] The opinion reads in pertinent part:

We think the "knowingly" language of 18 U.S.C. § 1461, and the instructions given by the District Court in this case satisfied the constitutional requirements of scienter. It is constitutionally sufficient that the prosecution show that a defendant had knowledge of the contents of the materials he distributed, and that he knew the character and nature of the materials. To require proof of a defendant's knowledge of the legal status of the materials would permit the defendant to avoid prosecution by simply claiming that he had not brushed up on the law. Such a formulation of the scienter requirement is required neither by the language of 18 U.S.C. § 1461 nor by the Constitution.
418 U.S. at 123-24.