923 P.2d 891

**STATE of Hawai'i, Plaintiff–Appellant/Cross–Appellee,[1]**

**v.**

**Noriyuki ARAKI, Defendant–Appellee/Cross–Appellant.**

Nos. 19042, 19130.

Supreme Court of Hawai'i.

Aug. 30, 1996.

1. For purposes of disposition, the appeal in No. 19042 was consolidated with the appeal in No. 19130 by order filed on July 22, 1996. The order indicates that for purposes of clarity and ease of reference the State of Hawai'i is referred to as the plaintiff-appellant/cross-appellee and Noriyuki Araki is referred to as the defendant-appellee/cross-appellant.

Vickie L.S. Kapp, Deputy Prosecuting Attorney, on the briefs, Honolulu, for plaintiff-appellant/cross-appellee State of Hawai'i.

Rose Anne Fletcher and J. Paul Breshears, Deputy Public Defenders, on the briefs, Honolulu, for defendant-appellee/cross-appellant Noriyuki Araki.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

MOON, Chief Justice.

In this consolidated appeal, involving promoting pornography for minors, plaintiff-appellant/cross-appellee State of Hawai'i (the prosecution) appeals from the circuit court's order granting defendant-appellee/cross-appellant Noriyuki Araki's motion to suppress pre-trial identification. Araki appeals from the circuit court's denial of his motions (1) to dismiss indictment based on insufficient evidence, and (2) for return of property and to suppress evidence. For the reasons discussed below, we hold that: (1) the circuit court properly denied Araki's motions (a) to dismiss indictment based on insufficient evidence, and (b) for return of property and to suppress evidence; and (2) the circuit court erred in granting Araki's motion to suppress pre-trial identification.

## I. *BACKGROUND*

This appeal presents this court with its first occasion to review the offense of promoting pornography for minors. *See* Hawai'i Revised Statutes (HRS) § 712–1215(1)(a) (1993).[2] On October 29, 1993, a fourteen year-old minor [hereinafter, CM] rented an X-rated[3] (adult) video, entitled "Blondes Who Crave Black Dicks" [hereinafter, the rented video], from Golf Academy of Hawai'i, Incorporated dba GAP Video Rental and Golf

Range [hereinafter, GAP Video], owned by Lynn Nose. CM did not have his parents' permission to rent an adult video.

A few weeks later, on November 23, 1993, an employee of GAP Video telephoned CM's mother [hereinafter, Mrs. CM] and informed her that her son had rented a video and that the video was overdue. After learning that the rented video was an adult video, Mrs. CM called the police to complain. When Honolulu Police Department (HPD) Officer Arcadio Ramos responded to Mrs. CM's call, Mrs. CM voluntarily turned the rented video over to the police.

In their subsequent investigation of the circumstances surrounding the rental of the adult video to CM, police learned that another minor [hereinafter, LL] had also allegedly rented an adult video, entitled "Texas Towers," from GAP Video. As part of the police investigation into that incident, HPD undercover officer Brian Johnson entered GAP Video and purchased "Texas Towers" [hereinafter, the purchased video].

Thereafter, on December 15, 1993, HPD Officer Victor Muniz requested a search warrant authorizing the search of the premises of GAP Video for various items associated with the rental of adult videos to CM and LL. The search warrant was granted the following day, December 16, 1993. Later that day, at approximately six o'clock in the evening, the police escorted CM and LL to GAP Video where both minors entered the store in an attempt to rent another adult video. When the minors exited the store, having failed in their "undercover" attempt to rent an adult video, the police executed the search warrant, recovering various items from the premises of GAP Video.

---

**2.** HRS § 712–1215 provides in pertinent part:
 **Promoting pornography for minors.** (1) A person commits the offense of promoting pornography for minors if:
 (a) Knowing its character and content, the person disseminates to a minor material which is pornographic for minors; ...
 ....
 (3) Promoting pornography for minors is a class C felony.

**3.** The reference here is to the rating system for films instituted by the Motion Picture Asso-

ciation of America. Under this system, films are classified into G, PG, [PG–13,] R, or X categories in descending order of presumed suitability for viewing by minors. Those containing sexually explicit scenes usually are placed in the X category. But films may be X-rated for other reasons, such as the high incidence of violence.
*State v. Bumanglag,* 63 Haw. 596, 602 n. 3, 634 P.2d 80, 85 n. 3 (1981) (citations omitted).

The police then conducted a two-person line-up composed of Araki and Mizuho (Mitchell) Kayama, both of whom were employees of GAP Video. CM and LL, who by that time were inside a police van with tinted windows, were asked whether either of the two individuals who were standing on the curb in front of the video store, had rented them an adult video. CM identified Araki as the person who had rented him an adult video on October 29, 1993; LL, however, was unable to identify the person who had rented him an adult video.

On the strength of CM's identification, Araki was arrested and, approximately a year later, on December 14, 1994, a grand jury indicted Araki for disseminating to CM,[4] a minor, material which is pornographic for minors, thereby committing the offense of promoting pornography for minors, in violation of HRS § 712–1215(1)(a).

On March 21, 1995, Araki filed the following motions: (1) "Motion to Dismiss Indictment Based on Insufficient Evidence"; (2) "Motion to Return Property and Suppress Evidence"; and (3) "Motion to Suppress Identification of Defendant." The circuit court denied motions (1) and (2), but granted motion (3), and these interlocutory appeals followed.

## II. *DISCUSSION*

### A. *Motion to Dismiss Indictment Based on Insufficient Evidence*

Araki contends that the indictment against him must be dismissed because: (1) the rented video was never subjected to a judicial determination of obscenity, in violation of the procedural requirements outlined in *Bumanglag;* [5] and (2) "[a]ssuming, *arguendo,* that a judicial determination [of obscenity] was not required, there was no evidence adduced to the grand jury that the rented video tape

was obscene due to a lack of serious literary, artistic, [political,] or scientific value as a whole."

### 1. The *Bumanglag* Case

Relying upon our decision in *Bumanglag,* Araki argues that, because the prosecution failed to obtain a judicial determination that the rented video was pornographic for minors, the grand jury proceeding was invalid, therefore, requiring dismissal of the indictment. We disagree because *Bumanglag* is wholly inapplicable to Araki's prosecution.

In *Bumanglag,* several prosecutions for promoting pornography arose out of a series of raids that the HPD had conducted against two movie theaters owned by Yuclan Enterprises, Inc. (Yuclan). *Id.* at 602, 634 P.2d at 84–85. The Yuclan theaters exhibited "X-rated" or "adult" films. *Id.* at 602, 634 P.2d at 85.

In that case,

[t]he *modus operandi* followed by the police was substantially similar in all cases. In each, the operation commenced with a police officer's purchase of an admission ticket and his viewing of the allegedly pornographic movie and observation of the persons associated with its screening. The officer then prepared a detailed affidavit describing what was observed for presentation to a district judge who, on the strength of the document, issued warrants authorizing searches for and the seizure of films described in the affidavit and warrants for the arrests of persons named as projectionists or ticket sellers at the theaters.

*Id.* The warrants were then executed, resulting in the arrests of projectionists and ticket sellers at the respective theaters and the seizure of single copies of several films at each theater. *Id.* at 602–03, 634 P.2d at 85. The defendants were then charged with the

---

4. Araki was not indicted for disseminating to LL material which is pornographic for minors.

5. Relying on *State v. Furuyama,* 64 Haw. 109, 637 P.2d 1095 (1981), Araki also contends that Officer Johnson's undercover purchase of the video "Texas Towers" was an illegal seizure. Because Araki was not indicted for renting "Texas Towers" to LL, the issue regarding the propri-

ety of the police investigation into that incident is not before us. However, we note that the United States Supreme Court, in *Maryland v. Macon,* 472 U.S. 463, 105 S.Ct. 2778, 86 L.Ed.2d 370 (1985), reached a result inconsistent with our holding in *Furuyama* that the undercover purchase of allegedly obscene material constitutes an illegal seizure.

offense of promoting pornography, in violation of HRS § 712–1214(1)(a). *Id.* at 603, 634 P.2d at 85. Yuclan, the owner of the theaters and the films, was not prosecuted.

Yuclan, claiming ownership of the films, subsequently moved, pursuant to Hawai'i Rules of Penal Procedure (HRPP) Rule 41(e),[6] for the return of the evidence seized. *Id.* Each defendant joined in the motions for the return of the evidence and also requested that the films be suppressed as evidence. *Id.* Yuclan's motions for the return of property seized were granted. *Id.* The defendants' motions to suppress the films as evidence against them were unsuccessful, and the defendants appealed. *Id.*

The issue on appeal was whether the motion picture films that were the subject of the charge were improperly *seized* and, therefore, inadmissible at trial. The fourth amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

In *Bumanglag,* the court recognized that " '[a] seizure reasonable as to one type of material in one setting may be unreasonable in a different setting or with respect to another kind of material.' " *Id.* at 605, 634 P.2d at 86 (quoting *Roaden v. Kentucky,* 413 U.S. 496, 501, 93 S.Ct. 2796, 2800, 37 L.Ed.2d 757 (1973)). In particular, the court noted that a warrant for the seizure of material presumptively protected by the first amendment is subject to a "higher hurdle in the evaluation of reasonableness", *id.* at 605 n. 7, 634 P.2d at 86 n. 7 (quoting *Roaden,* 413 U.S. at 504, 93 S.Ct. at 2801), because "the First Amendment stands as a joint yet separate source of limitations on a state's power to seek and impound expressive material." *Id.* at 605, 634 P.2d at 87.

To prevent the power to seize evidence from being used as a tool for the suppression of the freedom of expression, the *Bumanglag* court determined that "some form of *judicial* procedure 'designed to focus searchingly on the question of obscenity' must be a prelude to the seizure and retention of allegedly obscene material." *Id.* at 606, 634 P.2d at 87 (citing *Lee Art Theatre v. Virginia,* 392 U.S. 636, 637, 88 S.Ct. 2103, 2104, 20 L.Ed.2d 1313 (1968); *A Quantity of Books v. Kansas,* 378 U.S. 205, 210, 84 S.Ct. 1723, 1725–26, 12 L.Ed.2d 809 (1964); *Marcus v. Search Warrant,* 367 U.S. 717, 732, 81 S.Ct. 1708, 1716, 6 L.Ed.2d 1127 (1961)).

> The Court has been scrupulous in its insistence that the sensitive task of distinguishing legitimate from illegitimate speech be confided in a judicial office, rather than in the police. The judicial proceeding, however, need not be of an adversary nature at the outset. A warrant for the seizure of a copy of a film for the purpose of preserving it as evidence in a criminal proceeding may still be issued *ex parte,* if a detached, neutral judge is afforded full opportunity to focus searchingly on the question of obscenity prior to finding probable cause. But in this situation, the seizure when effected must be followed by a prompt judicial determination of the obscenity issue in an adversary proceeding available at the request of any interested party. And "prompt" in the Court's contemplation means "the shortest period 'compatible with sound judicial resolution.' " Absent this speedy judicial declaration, a seizure and retention of the arguably protected material would be constitutionally impermissible. For the delay may "in itself become a form of censorship."

---

6. HRPP Rule 41(e) provides:
 **Motion for return of property and to Suppress Evidence.** A person aggrieved by an unlawful search and seizure may move the court having jurisdiction to try the offense for the return of the property, or to suppress for use as evidence anything so obtained, or both. The judge shall receive evidence on any issue of fact necessary to the decision of the motion. If the motion is granted the property shall be restored unless otherwise subject to lawful detention and it shall not be admissible in evidence at any hearing or trial.

*Id.* at 606–607, 634 P.2d at 87–88 (citations, some quotation marks, footnotes, and ellipses omitted). Accordingly, the *Bumanglag* court announced that the seizure "of arguably protected material as evidence to further obscenity prosecutions," *id.* at 609, 634 P.2d at 89, in addition to being subject to the general procedures governing searches and seizures prescribed by HRPP Rule 41, is also subject to the following procedure:

1. A warrant for the seizure of films or other forms of expression as evidentiary material to support an obscenity prosecution shall be issued contemporaneously with or subsequent to the filing of an arrest warrant, complaint, or charge in the case.

2. A warrant for the seizure of films and other forms of expression shall not be issued solely on the conclusory opinion of a police officer that the material is obscene.

3. A warrant may be issued after an adversary hearing that focuses searchingly on the question of the obscenity of the material sought, or it may be issued *ex parte.*

4. Where the warrant is an *ex parte* warrant for a seizure of films or a seizure that will significantly limit public access to other forms of expression, it shall contain a notice to the following effect:

 (a) an interested party may move, pursuant to Rule 41(e), Hawaii R. Penal P., to have the issue of obscenity *vel non* of the seized material determined promptly in an adversary hearing and that the motion shall be heard on written notice given all other interested parties of at least forty-eight (48) hours;

 (b) unless an interested party moves for a prompt determination within ten (10) days of the seizure or within five (5) days of the arraignment of the defendant in the related prosecution before the court where he [or she] is to be tried, the party shall be deemed to have waived his [or her] right to such hearing and the issue of obscenity shall be determined at trial.

5. If a party moves for a prompt determination, a hearing on the issue of obsceni-

ty shall be commenced within seven (7) days of the filing of the motion, and a decision shall be rendered within ten (10) days thereafter, unless justice demands otherwise.

6. If the material is found to be obscene, the State may retain the material for use as evidence in the related prosecution. If the material is determined not to be obscene, it shall be returned forthwith to the party from whom it was seized.

7. When the material seized is a motion picture film and a showing is made at any time prior to the determination of obscenity that other copies of the film are unavailable for exhibition, the owner or exhibitor shall be permitted to copy the film for exhibition pending the determination.

*Id.* at 609–610, 634 P.2d at 89–90.

■■■ By its own terms, the procedural protections outlined in *Bumanglag,* which stem from the first amendment protections afforded presumptively expressive material, are implicated only when there is a seizure "of arguably protected material as evidence to further obscenity prosecutions." *Id.* at 609, 634 P.2d at 89. In other words, as the United States Supreme Court stated in *Macon:*

The First Amendment imposes special constraints on searches for and seizures of presumptively protected material, and requires that the Fourth Amendment be applied with "scrupulous exactitude" in such circumstances. *Stanford v. Texas,* 379 U.S. 476, 485 [85 S.Ct. 506, 511, 13 L.Ed.2d 431] (1965). Consequently, the Court has imposed particularized rules applicable to searches for and seizures of allegedly obscene films, books, and papers. *See, e.g., Roaden v. Kentucky,* 413 U.S. 496, 497 [93 S.Ct. 2796, 2797, 37 L.Ed.2d 757] (1973) ("seizure of allegedly obscene material, contemporaneous with and as an incident to an arrest for the public exhibition of such material ... may [not] be accomplished without a warrant"); *Marcus v. Search Warrant* 367 U.S. 717 [81 S.Ct. 1708, 6 L.Ed.2d 1127] (1961) (warrant to seize allegedly obscene magazines must be particularized and may not issue merely on

officer's conclusory assertion).... *[However, a]bsent some action taken by government agents that can properly be classified as a "search" or a "seizure," the Fourth Amendment rules designed to safeguard First Amendment freedoms do not apply.* 472 U.S. at 468–69, 105 S.Ct. at 2781–82 (some citations omitted and emphasis added). The procedural requirements outlined in *Bumanglag* are thus rendered inapplicable to Araki's prosecution because in the present case there was no "seizure" of presumptively protected material.

 "A seizure occurs when 'there is some meaningful interference with an individual's possessory interests' in the property seized." *Macon,* 472 U.S. at 469, 105 S.Ct. at 2782 (citing *United States v. Jacobsen,* 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85 (1984)). We have acknowledged that, when civilians "act as agents of the police [in conducting a search or seizure,] the full panoply of constitutional provisions and curative measures applies." *State v. Boynton,* 58 Haw. 530, 536, 574 P.2d 1330, 1334 (1978) (citations omitted). However, in order to implicate the protections of the fourth amendment, the seizure in question must have been occasioned by the government, as opposed to a private party. *Id.* at 531, 534, 574 P.2d at 1331, 1333 (stating that the fourth amendment to the United States Constitution and article I, section 5 of the Hawai'i State Constitution protect against unreasonable intrusions by the government, but not against those of private persons and citing *Burdeau v. McDowell,* 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1921), wherein the court held that the fourth amendment is a limitation upon only the government and, therefore, evidence secured by private searches need not be excluded from a criminal trial even if the private search had been illegal).

For example, in *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), as part of a murder investigation, police officers went to a suspect's home to investigate the suspect's story. The police asked the suspect's wife about any guns there might be in the house, and the wife responded that there were four guns in the house. The suspect's wife then offered to let the police take the guns and various articles of her husband's clothing, which offer the police accepted. The Court held that no search and seizure were implicated by the police visit to the suspect's home when the police obtained the guns and clothing from the suspect's wife.

The Court explained:

Had [the suspect's wife], wholly on her own initiative, sought out her husband's guns and clothing and then taken them to the police station to be used as evidence against him, there can be no doubt under existing law that the articles would later have been admissible in evidence. *Cf. Burdeau v. McDowell,* 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048. The question presented here is whether the conduct of the police officers at the Coolidge house was such as to make her actions their actions for purposes of the Fourth and Fourteenth Amendments and their attendant exclusionary rules. The test ... is whether [the suspect's wife], in light of all the circumstances of the case, must be regarded as having acted as an "instrument" or agent of the state when she produced her husband's belongings.

... The exclusionary rules were fashioned "to prevent, not to repair," and their target is official misconduct. They are "to compel respect for the constitutional guaranty in the only effectively available way— by removing the incentive to disregard it." *Elkins v. United States,* 364 U.S. 206, 217, 80 S.Ct. 1437, 1444, 4 L.Ed.2d 1669. *But it is no part of the policy underlying the Fourth and Fourteenth Amendments to discourage citizens from aiding to the utmost of their ability in the apprehension of criminals.* If, then, the exclusionary rule is properly applicable to the evidence taken from the [suspect's] house ..., it must be upon the basis that some type of unconstitutional police conduct occurred.

Yet it cannot be said that the police should have obtained a warrant for the guns and clothing before they set out to visit [the suspect's wife], since they had no intention of rummaging around [the sus-

pect's] effects or of dispossessing him of any of his property.

*Coolidge,* 403 U.S. at 487–88, 91 S.Ct. at 2048–49 (some citations omitted).

As previously stated, upon discovering that GAP Video had rented her minor son an adult video without her permission, Mrs. CM telephoned the police to complain. When the police arrived at her home, Mrs. CM played the rented video for the police for a few minutes and then voluntarily turned the video over to the police. Given the facts that Mrs. CM, a private individual, acting on her own initiative, secured the videotape and voluntarily transferred its possession to the police, there was no seizure within the meaning of the fourth amendment. *See United States v. Coleman,* 628 F.2d 961, 966 (6th Cir.1980) ("[T]here is no seizure within the meaning of the Fourth Amendment when an object discovered in a private search is voluntarily relinquished to the government."); *People v. McKendrick,* 188 Mich.App. 128, 468 N.W.2d 903, 910–11 (1991) ("[T]here is no seizure within the meaning of the Fourth Amendment when an object discovered in a private search is voluntarily turned over to the government."). Consequently, the procedural requirements that attend to seizures of expressive material in support of obscenity prosecutions announced in *Bumanglag* do not apply to the instant prosecution. Accordingly, we hold that, under the circumstances of this case, the prosecution was not required to seek a judicial determination that the rented video was pornographic for minors.

2. The grand jury was presented sufficient evidence from which to conclude that the rented video appealed to a minor's prurient interest and lacked serious literary, artistic, political,or scientific value.

■ Araki was indicted for promoting pornography for minors, in violation of HRS § 712–1215(1)(a), which, as previously noted, provides in pertinent part that "[a] person commits the offense of promoting pornography for minors if: (a) [k]nowing its character and content, the person disseminates to a minor material which is pornographic for minors[.]" Material that is pornographic for minors is defined in HRS § 712–1210(7) (1993), which states in pertinent part:

Any material ... is "pornographic for minors" if:

(a) It is primarily devoted to explicit and detailed narrative accounts of sexual excitement, sexual conduct, or sadomasochistic abuse; and:

(i) It is presented in such a manner that the average person applying contemporary community standards, would find that, taken as a whole, it appeals to a minor's prurient interest; and

(ii) Taken as a whole, it lacks serious literary, artistic, political, or scientific value[.]

Araki maintains on appeal that his motion to dismiss the indictment should have been granted because the grand jury was not presented with sufficient evidence to find probable cause that the video rented to CM was pornographic for minors, that is, that the rented video, taken as a whole, lacks serious literary, artistic, political, or scientific value. We disagree.

This court has previously stated that "[a] motion to dismiss an indictment because of the incompetency of evidence before a grand jury is addressed to the discretion of the trial court. The decision of the trial court will not be reversed unless there has been abuse of such discretion." *State v. Corpuz,* 67 Haw. 438, 440, 690 P.2d 282, 284 (1984). "The trial court abuses its discretion when it clearly exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant." *State v. Furutani,* 76 Hawai'i 172, 179, 873 P.2d 51, 58 (1994) (citations omitted).

■ Article I, section 10 of the Hawai'i Constitution provides in part that "[n]o person shall be held to answer for a capital or otherwise infamous crime, unless on a presentment or indictment of a grand jury or upon a finding of probable cause after a preliminary hearing held as provided by law[.]" "A grand jury indictment must be based on probable cause. Probable cause means such a state of facts as would lead a person of ordinary caution or prudence to

believe and conscientiously entertain a strong suspicion of the guilt of the accused." *State v. Chung*, 75 Haw. 398, 409–410, 862 P.2d 1063, 1073 (1993) (citations, internal quotation marks, and brackets omitted).

The grand jury was presented the following testimony of HPD Officer Muniz:

Q: [By the prosecutor] [P]ursuant to [your] investigation[,] was a VHS Video Tape entitled, "Blondes Who Crave Black Dicks" recovered from [Mrs. CM]?

A: [By Officer Muniz] Yes it was.

Q: Did you review this video tape?

A: Yes I did.

Q: What was the nature of the contents of that tape?

A: [U]pon viewing the tape, it contained ... approximately twelve scenes ... twelve various scenes ... which *didn't contain a story line or plot*, it contained ... caucasian and black males and females engaging in different types of sexual acts[;] these acts included sexual intercourse, flagitious [sic], cunnilingus, masturbation, ejaculation, group sex, digital intercourse, also, doing [sic] the filming of this film, they showed ... explicit close-up of the various sex acts.

Q: So the film was primarily devoted to explicit and detailed visual accounts of sexual encounters, is that correct?

A: Yes it was.

Q: Did the film depict a human male or female genitals?

A: Yes it did.

Q: Did the film depict sexual intercourse or physical contact with the person's unclothed genitals, ... pubic area, buttocks, or breast?

A: Yes it did.

Q: And did it appear that, that was *for the purposes of sexual stimulation or gratification?*

A: Yes.

In addition, CM testified before the grand jury that the cover of the rented video depicted people engaged in intercourse and that the film itself was primarily devoted to depicting people engaged in intercourse. Also, Mrs. CM testified that she had learned from the video store manager at the time he called her about the overdue rented video that the video was "X-rated."

The question here is whether the grand jury was presented with sufficient information regarding the contents of a purportedly pornographic video in making a probable cause determination that the video: (1) is presented in such a manner that the average person, applying contemporary community standards, would find that, taken as a whole, it appeals to a minor's prurient interest; and, (2) taken as a whole, lacks serious literary, artistic, political, or scientific value. HRS §§ 712–1210(7)(a)(i) and –1210(7)(a)(ii).

Probable cause has been established when it can be said that a reasonable and prudent person viewing the evidence would have a strong suspicion that a crime had been committed. Furthermore, every legitimate inference that may be drawn from the evidence must be drawn in favor of the indictment and *neither the trial court nor the appellate court on review may substitute its judgment as to the weight of the evidence for that of the Grand Jury.*

*State v. Kuba*, 68 Haw. 184, 191, 706 P.2d 1305, 1310–11 (1985) (citations and internal quotation marks omitted) (emphasis in original). In light of the witnesses' testimony, particularly that of Officer Muniz, regarding the content of the rented video, and drawing every legitimate inference that can be drawn from the evidence in favor of the indictment, we hold that the grand jury was presented sufficient information to determine the existence of probable cause that the material distributed to CM by Araki (1) appealed to a minor's prurient interest and, (2) taken as a whole, lacked serious literary, artistic, political, or scientific value.

### B. *Motion For Return of Property and to Suppress Items of Evidence*

Araki's motion for the return of property and to suppress items of evidence (motion to suppress) sought the return and suppression of the following items:

1. Time card for Noriyuki Araki (12/14–12/31), Work Schedule for Video Gap

(10/16–10/31), Payroll work schedule for Noriyuki Araki (10/16–10/31, 11/1–11/15, and 11/16–11/30), personal file of Noriyuki Araki, and other items seized pursuant to the search warrant, which were seized on the date of December 16, 1993, ... at the place of GAP Video.[7]

2. [The rented] [v]ideo tape, ... which was seized on or about November 23, 1993, [from the home of Mrs. CM].

On appeal, Araki contends that the circuit court erred in denying his motion to suppress because: (1) the items described in paragraph 1 above [hereinafter, the search warrant evidence] were seized pursuant to an unlawful search warrant; and (2) the rented video was seized without a search warrant; thus, both the search warrant evidence and the rented video should be suppressed. Because we hold that Araki lacks standing to challenge the seizure of the search warrant evidence and the rented video, we hold that the circuit court properly denied Araki's motion to suppress. In our previous discussion, we held that the rented video was not the subject of an unlawful seizure; therefore, our discussion of standing focuses on Araki's contention with respect to the search warrant evidence.

In *State v. Abordo,* 61 Haw. 117, 596 P.2d 773 (1979), this court explained:

The freedom of individuals from unreasonable searches and seizures is a fundamental guarantee provided for by the Fourth Amendment to the United States Constitution and Article I, Section 5 of the Constitution of the State of Hawaii. To effectuate the Fourth Amendment guarantee, the United States Supreme Court has conferred upon defendants in both state and federal criminal prosecutions the right to have excluded from trial evidence which has been obtained by means of an unlawful search and seizure. . . .

The ability of a defendant to benefit from the protection of the so-called "exclusionary rule" is, however, not without limitation. The United States Supreme Court

has indicated that the "rights assured by the Fourth Amendment are personal rights, and that they may be enforced by exclusion of evidence only at the instance of one whose own protection was infringed by the search and seizure." Hence, in a case such as the one at bar, *the proponent of a motion to suppress has the burden of establishing not only that the evidence sought to be excluded was unlawfully secured, but also, that his own Fourth Amendment rights were violated by the search and seizure sought to be challenged.*

*Id.* at 120–121, 596 P.2d at 775 (emphasis added) (citations omitted).

At the hearing on Araki's motion to suppress, Araki's counsel acknowledged that "there has to be an issue of standing here which is an issue of whether the defendant has any standing here to suppress these items[.] The indication here is that the defendant himself is not the owner of any of these materials." Although the circuit court denied the motion to suppress, the court found that Araki had standing to challenge the search warrant evidence. Specifically, the court stated: "The court will find that defendant has standing. He's the only one sitting here with these charges hanging over him, not the owner, not anybody else, or the maker of the video so he has standing."

Both in his motion to suppress and again on appeal, Araki fails to allege that the seizure of the search warrant evidence violated his personal rights.

Just who should be deemed a "victim of the search" under [traditional exclusionary rule analysis] is a difficult and provocative question. . . . Sometimes the Court has been inclined to define certain bases of standing in terms of property concepts; it has been indicated that standing may be acquired by having a "proprietary or possessory interest in the premises" which were searched, or by virtue of a "property interest" in the items which are seized. On other occasions the Court has been critical of such an approach. In *Mancusi v. Deforte* [, 392 U.S. 364, 368, 88 S.Ct.

---

7. Other items recovered pursuant to the December 16, 1993 search warrant include a computer, membership applications for both CM and LL, a movie list, GAP Video rental receipts, and the rental receipt for CM on October 29, 1993 for the rented video.

2120, 2123–24, 20 L.Ed.2d 1154 (1968),] the Court held "that capacity to claim the protection of the Amendment depends not upon a property right in the involved place but upon whether the area was one in which there was a reasonable expectation of freedom from governmental intrusion."

These various assertions by the Court are not in inevitable conflict. The fundamental inquiry regarding standing to object to a search is that articulated in *Mancusi:* whether the conduct which the defendant wants to put in issue involved an intrusion into *his* [or her] reasonable expectation of privacy.

5 W.R. LaFave, *Search and Seizure,* § 11.3, at 118–19 (3d ed.1996) (emphasis in original) (footnotes omitted) [hereinafter, LaFave]. Araki alleges no such expectation, and, thus, his only complaint appears to be that the search warrant evidence is to be used against him in a criminal proceeding, a complaint which does not entitle Araki to Fourth Amendment protection. In *State v. Narvaez,* 68 Haw. 569, 722 P.2d 1036 (1986), this court stated that:

> In order to assert legal standing under traditional exclusionary rule analysis, an individual's personal rights must have been violated. The United States Supreme Court ruled the "suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence...." *Alderman v. United States,* 394 U.S. 165, 171–72, 89 S.Ct. 961, 965, 22 L.Ed.2d 176 (1969).

*Id.* at 573–74, 722 P.2d at 1038; *see also* LaFave, *supra,* § 11.3, at 118 ("As the Court put it in *Jones v. United States,* [362 U.S. 257, 261, 80 S.Ct. 725, 731, 4 L.Ed.2d 697 (1960),] for a defendant to have standing upon a motion to suppress it is not sufficient that he [or she] 'claims prejudice only through the use of evidence gathered as a consequence of a search or seizure directed at someone else'; rather, he [or she] 'must have been a victim of a search or seizure.' 'This standing rule,' the Court explained on a later occasion, 'is premised on a recognition

that the need for deterrence and hence the rationale for excluding the evidence are strongest where the Government's unlawful conduct would result in imposition of a criminal sanction on the victim of the search.' [*United States v. Calandra,* 414 U.S. 338, 348, 94 S.Ct. 613, 620, 38 L.Ed.2d 561 (1974) ]." (Footnotes omitted.)). Accordingly, we hold that Araki lacks standing to challenge the seizure of the search warrant evidence.

### C. *Motion to Suppress Pre-Trial Identification*

■ As stated previously, Araki also moved to suppress CM's pre-trial identification of Araki at the two-person line-up conducted on December 16, 1993, outside the premises of GAP Video. The circuit court, concerned with the "suggestability of th[e] process," granted Araki's motion to suppress the pre-trial identification. In its appeal from the circuit court's grant of Araki's motion, the prosecution contends that Araki's motion to suppress CM's pre-trial identification should have been denied because the identification procedure was not overly suggestive and, even if suggestive, the identification was nonetheless sufficiently reliable.

> When the defendant challenges admissibility of eyewitness identification on the grounds of impermissibly suggestive pretrial identification procedure, he or she has the burden of proof, and the court, trial or appellate, is faced with two questions: (1) whether the procedure was impermissibly or unnecessarily suggestive; and (2) if so, whether, upon viewing the totality of the circumstances, such as opportunity to view at the time of the crime, the degree of attention, and the elapsed time, the witness's identification is deemed sufficiently reliable so that it is worthy of presentation to and consideration by the jury.

*State v. Okumura,* 78 Hawai'i 383, 391, 894 P.2d 80, 88 (1995) (internal brackets and citations omitted).

■ Although the circuit court concluded that the procedure was unduly suggestive and that the identification was not otherwise sufficiently reliable,

the questions of suggestiveness and reliability are questions of law that are freely reviewable on appeal. On the other hand, answering these questions involves determinations of fact by the court. Appellate review of factual determinations made by the trial court deciding pretrial motions in a criminal case is governed by the clearly erroneous standard. A finding of fact is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake has been made.

*Okumura*, 78 Hawai'i at 391–392, 894 P.2d at 88–89 (citations and quotation marks omitted). We agree with the prosecution that, even if the identification procedure in this case—a two-person line-up conducted in front of the video store—was unduly suggestive, CM's identification of Araki was nonetheless sufficiently reliable.

■ The factors to be considered in determining the reliability of an identification include

the opportunity of the witness to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of the witness's prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and confrontation.

*Okumura*, 78 Hawai'i at 392, 894 P.2d at 89 (citations and internal brackets omitted).

The circuit court's findings of fact relevant to the reliability issue include the following:

1. On October 29, 1993 juvenile [CM] entered the GAP Video store with his friend. The salesperson on duty asked [CM] if he wanted to apply for membership for video rentals. [CM] replied that he wanted to and proceeded to fill out the membership application form and showed

the clerk his I.D. [CM] was asked for a [credit card] which he did not have and was not able to produce.

. . . .

4. [CM] was not wearing his prescription glasses at the time [he rented the adult video from the Gap video store].

5. On or about December 14, 1993, [CM] gave a description of the salesclerk to Officer Victor Muniz ... as a short, skinny Japanese male, approximately 5'4" to 5'5" tall and about 120 pounds.

. . . .

[10.] The identification witness was, at the time, a fourteen year old male who had been in the store three times....[8]

[11.] [CM] was in the store for half an hour filling out forms and looking for his friend in the store.[9]

The prosecution does not specifically challenge any of these findings of fact and none of them appear to be clearly erroneous.

Our evaluation of the facts in conjunction with the relevant factors to be considered in determining reliability supports the conclusion that the pre-trial identification of Araki was sufficiently reliable for presentation to the jury. CM had been in GAP Video on several prior occasions when Araki was in the store. Although CM was not wearing his prescription glasses at the time he rented the video, CM testified that he is nearsighted and that he spent approximately five minutes within two to three feet of Araki at the counter. At the time of the identification, CM was situated within approximately four feet of Araki.[10] The level of certainty was high; Officer Muniz testified that when CM identified Araki, CM was calm and did not waiver in his identification of Araki. The length of time between the crime (October 29, 1993) and the confrontation (December 16, 1993) is not particularly significant—"it is neither so short as to favor reliability nor too

---

8. This finding of fact is labeled as a conclusion of law in the circuit court's June 6, 1995 order granting Araki's motion to suppress pre-trial identification, which order was prepared by the office of the public defender.

9. *See supra* note 8.

10. The record reflects that, when the two individuals were brought out to the curb in front of the GAP Video store, the van in which CM was sitting was parked across the street. CM indicated to the police that he could not see from that distance. Therefore, the van was driven up to the curbside in order to afford CM a closer look.

long as to raise any serious doubts." *Okumura*, 78 Hawai'i at 393, 894 P.2d at 90 (discounting eight week period).

Based on the totality of the circumstances, the circuit court, in our view, erroneously concluded that CM's identification was not sufficiently reliable to overcome any suggestiveness in the identification procedure. "Thus, the weight of the identification testimony and the credibility of the witnesses were for the jury to determine. The defense counsel could cross-examine the witnesses, point out any suggestibility in the identification procedure, and present countervailing testimony such as alibi." *State v. Masaniai*, 63 Haw. 354, 365, 628 P.2d 1018, 1026 (1981) (citations omitted). We therefore hold that the circuit court erred in granting Araki's motion to suppress pre-trial identification.

### III. *CONCLUSION*

For the foregoing reasons, we affirm the circuit court's denial of Araki's motion to dismiss based on insufficient evidence and his motion for return of property and to suppress evidence. We also reverse the circuit court's order granting the defendant's motion to suppress pre-trial identification.

LEVINSON, Judge, concurring.

I agree with the opinion of the court that Araki lacked standing to challenge the seizure of the "search warrant evidence" and that the circuit court erred in granting Araki's motion to suppress his pre–trial identification.

I have personal reservations, however, as to whether, as applied, Hawai'i Revised Statutes (HRS) § 712–1210(7) (1993), and, therefore, HRS § 712–1215 (1993), into which the former is imported, pass muster under the Hawai'i Constitution (1978). Araki tickles the issue by arguing that (1) "there was no evidence adduced to the grand jury that the rented video tape was obscene due to a lack of serious literary, artistic, political, or scientific value as a whole," and, therefore, (2) "the [circuit] court clearly erred in denying ... Araki's [m]otion to [d]ismiss the [i]ndictment ... because there was no ... evidence

adduced ... to meet the sufficiency level required to support an indictment for this offense under ... [a]rticle I, [s]ection 4 ... of the [Hawai'i] Constitution."

Nevertheless, I do not read Araki's points of error on appeal, and his arguments in support thereof, to raise the constitutional question. Accordingly, it was not necessary for the opinion of the court to reach it.[1] For this reason alone, I join in the court's holding that the evidence adduced before the grand jury was sufficient to support a finding of probable cause to believe that Araki violated HRS § 712–1215(1)(a).

1. I should add that I have no idea how a majority of the court would resolve the question.